TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
KAREN E. ESCALANTE (Cal. Bar No. 304686)
Assistant United States Attorneys
Major Frauds Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6527/3358
        Facsimile: (213) 894-6269
        E-mail: scott.paetty@usdoj.gov
                karen.escalante@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>                v.<br><br>MARK A. LOMAN,<br><br>                Defendant. | No. 19-CR-695-DSF<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MARK A. LOMAN; DECLARATION OF KAREN E. ESCALANTE; EXHIBITS<br><br>Hearing Date: November 29, 2021<br>Hearing Time: 8:30 a.m.<br>Location:     Courtroom of the<br>              Hon. Dale S.<br>              Fischer |

        Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Scott Paetty and
Karen Escalante hereby files its sentencing position regarding
defendant Mark A. Loman.

        This sentencing position is based upon the attached memorandum
of points and authorities and the accompanying exhibits, the
presentence investigation report, the files and records in this case,

and any other evidence or argument that the Court may wish to consider at the time of sentencing.

The government reserves the right to file any supplemental sentencing positions that may be necessary.

Dated: November 15, 2021          Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____

SCOTT PAETTY
KAREN E. ESCALANTE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                  PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   DEFENDANT'S OFFENSE CONDUCT...................................3

      A.    Defendant's Q2 FY2016 Trades...........................4

      B.    Defendant's AS&E Trade.................................5

III.  ADVISORY SENTENCING GUIDELINES CALCULATION...................6

IV.   SECTION 3553(a) FACTORS......................................7

V.    GOVERNMENT'S SENTENCING RECOMMENDATION.......................8

      A.    Term of Custody........................................8

            1.    Nature and Circumstances of the Offense and
                  History and Characteristics of the Defendant (18
                  U.S.C. § 3553(a)(1))............................8

            2.    Seriousness of the Offense, Respect for the Law,
                  Just Punishment, and Deterrence (18 U.S.C. §
                  3553(a)(2)....................................14

            3.    The Kinds of Sentence and the Sentencing Range
                  Established by the Sentencing Guidelines and the
                  Need to Avoid Unwarranted Sentence Disparities
                  (18 U.S.C. § 3553(a)(4), (a)(6))..............16

      B.    Restitution...........................................17

      C.    Supervised Release....................................18

      D.    Fine..................................................19

      E.    Mandatory Special Assessment..........................20

VI.   CONCLUSION..................................................21

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**CASES**

Gall v. United States,
        552 U.S. 38 (2007)...........................................................8

In re: Akebia Therapeutics, Inc.,
        981 F.3d 32 (1st Cir. 2020).................................................20

Lagos v. United States,
        138 S. Ct. 1684 (2018).....................................................19

Molina-Martinez v. United States,
        136 S. Ct. 1338 (2016)......................................................8

United States v. Afriyie,
        No. 16-cr-377 (PAE), 2020 WL 634425 (S.D.N.Y. Feb. 11,
        2020).....................................................................19

United States v. Carty,
        520 F.3d 984 (9th Cir. 2008).................................................7

United States v. Gupta,
        925 F. Supp. 2d 581 (S.D.N.Y. 2013)........................................19

United States v. Petit,
        No. 19-CR-850 (JSR), 2021 WL 2056826 (S.D.N.Y. May 23,
        2021).....................................................................19

United States v. Rita,
        551 U.S. 338 (2007)..........................................................8

United States v. Skowron,
        839 F. Supp. 2d 740 (S.D.N.Y. 2012)........................................19

**STATUTES**

18 U.S.C. § 3553(a)...........................................................passim

18 U.S.C. § 3583(c)...............................................................20

18 U.S.C. § 3663A.................................................................18

18 U.S.C. § 3664..............................................................19, 20

**OTHER AUTHORITIES**

The Criminal History of Federal Economic Crime Offenders,
        USSG (Feb. 2020), available at:
        https://www.ussc.gov/sites/default/files/pdf/research-and-
        publications/research-publications/2020/20200227_Crim-Hist-
        Econ.pdf (last visited November 15, 2021)......................18

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

U.S.S.G. § 2B1.1................................................6, 7

U.S.S.G. § 2B1.4..................................................6

U.S.S.G. § 3B1.3..................................................6

U.S.S.G. § 3D1.2..................................................7

U.S.S.G. § 3E1.1..................................................6

U.S.S.G. § 5E1.1.................................................21

U.S.S.G. § 5E1.2.................................................22

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3        Defendant Mark A. Loman ("defendant") awaits sentencing

4   following his conviction by a jury of eight federal felonies relating

5   to illegal stock trades he made based on inside information he gained

6   through his role as vice president and corporate controller for OSI

7   Systems, Inc. ("OSI").  Defendant abused the position of trust he

8   held at OSI to line his own pockets with nearly half a million

9   dollars in ill-gotten gains he made using OSI's material, non-public

10  information.  A significant custodial sentence is necessary to

11  reflect the seriousness of his crimes and afford adequate deterrence

12  to future criminal conduct by defendant or others similarly situated

13  to defendant who wish to flagrantly violate the laws governing the

14  free and fair operation of the United States' securities markets.

15       On October 25, 2021, the United States Probation & Pretrial

16  Services Office ("USPO") issued its presentence investigation report

17  ("PSR") for defendant as well as a recommendation letter.  ("PSR",

18  ECF 107; Recommendation Letter, ECF 106.)  The USPO calculated that

19  defendant's total offense level under the United States Guidelines

20  ("U.S.S.G." or "Guidelines") was 24 and determined that defendant

21  falls within Criminal History Category I, which results in an

22  advisory Guidelines range of 51-63 months' imprisonment.  (PSR ¶¶ 51,

23  57, 112.)

24       For the reasons set forth in the government's response to the

25  PSR (ECF 109), the government respectfully disagrees with the USPO's

26  loss calculations and its resulting offense level.  The government

27  submits that defendant's total gain should be limited to the

28  $476,710.08 in profit he received from the trades for which he was

convicted, which results in a total offense level of 22 (base offense level of 8, plus 12-level increase for gain of more than $250,000 but less than $550,000, plus a 2-level increase for defendant's abuse of a position of trust). Accordingly, the government submits that defendant's advisory Guidelines range is 41-51 months.

The USPO recommended that the Court sentence defendant to 15 months' imprisonment which the USPO recognizes is a significant variance outside the advisory Guidelines range. (ECF 106 at 1-2, 4.) The USPO further recommended that the Court impose a two-year term of supervised release, a fine of $600,000, and a mandatory special assessment of $800. (Id. at 1, 5.) The USPO did not recommend that restitution be imposed because it concluded that restitution did not apply in this case. (PSR ¶¶ 108, 123.)

The USPO's recommended variance represents a variance of approximately 10 levels from the PSR's calculations, or eight levels from the government's calculations, which the government submits is unjustified and would result in unwarranted disparities in sentencing. Accordingly, the government respectfully disagrees with the USPO's sentencing recommendation. In addition, for the reasons set forth in the government's response to the PSRt (ECF 109), the government also disagrees with the USPO's conclusion that restitution does not apply in this case.

For the reasons stated below, the government respectfully recommends that the Court sentence defendant to 51 months in custody, three years of supervised release, a mandatory special assessment of $800, and a fine of $600,000. The government further requests that the Court set a date for the final determination of restitution not to exceed 90 days after sentencing.

## II.   DEFENDANT'S OFFENSE CONDUCT

The following summary of defendant's offense conduct is based on facts stated in the PSR ¶¶ 16-31.[1]  From approximately August 2006 until approximately December 2017, defendant was the Vice President and Corporate Controller of OSI Systems, Inc. ("OSI"), a publicly traded company based in Hawthorne, California.  OSI's shares are traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ"), a national securities exchange, under the ticker symbol "OSIS".

OSI has three subsidiaries or divisions: (1) the Security Division, also known as Rapiscan; (2) the Healthcare Division, also known as Spacelabs; and (3) the Optoelectronics and Manufacturing Division.  As OSI's Corporate Controller (of the parent company to these subsidiaries), defendant reported directly to OSI's Chief Financial Officer ("CFO"), performed accounting functions with respect to the financial performance of each subsidiary, communicated regularly with the finance departments of each subsidiary and regularly received financial reports and updates for the subsidiaries and for OSI as a whole.

Between October 1, 2015 and December 31, 2015, which constituted the second quarter of OSI's fiscal year 2016 ("Q2 FY2016"), defendant received nonpublic information about OSI's financial performance.  Specifically, defendant received nonpublic information that OSI and its subsidiaries were financially underperforming and that OSI was at risk of missing its revenue forecasts for Q2 FY2016.  The information evidenced concern among OSI executives that the actual revenue

---

[1] Facts taken from sources other than the PSR are noted in separate parenthetical citations.

3

numbers being reported by the divisions showed that OSI would not meet earnings projections that were reflected in OSI sales guidance that had been provided to stock analysts and traders in the investment community.

## A.   Defendant's Q2 FY2016 Trades

On November 18, 2015, defendant sold short 3,000 shares of OSI stock.  On December 27, 2015, OSI initiated a blackout period prohibiting OSI insiders, including defendant, from trading OSIS securities.  On December 28, 2015, during the blackout period, defendant purchased 100 OSIS put option contracts with a strike price of $90 which expired in February 2016.  That same day, defendant also sold 100 OSIS call option contracts with a strike price of $95 which expired in February 2016.  And, in another transaction that same day, defendant sold 50 OSIS call option contracts with a strike price of $95 which expired in April 2016.  As the government's expert testified at trial, each of these trades was a bet that the stock price of OSI would go down.  (Tr. 702:1-13)

On January 27, 2016, OSI announced that its second quarter revenues decreased 23% as compared to the prior year, and OSI lowered its sales and earnings guidance.  The closing price of OSIS shares that day was approximately $76.25.  The next day, the share price of OSIS shares declined sharply.  On January 28, 2016, the closing price of OSIS shares was approximately $52.02.

On February 1, 2016, defendant sold the 100 OSIS put option contracts he purchased in December 2015 and made a profit of $313,820.94.  (Declaration of Karen Escalante ("Escalante Decl."), GEX 76 (Loman Trading Profits Calculations Chart).)  About two weeks later, on February 17, 2016, defendant purchased 3,000 OSIS shares to

cover the short position he established in November 2015 and made a profit of $90,263.32.  (Id.)  The call option contracts defendant sold in December 2015 expired worthless on February 19, 2016, and April 15, 2016, thereby allowing defendant to keep the proceeds from his sale of the call option contracts, resulting in a profit of $42,015.10.  (Id.)

**B.   Defendant's AS&E Trade**

On February 15, 2016, defendant traveled to Kansas City, Missouri with OSI's CFO.  While in Kansas City, on February 16, 2016, the CFO participated in a call with Morgan Stanley investment bankers to discuss a draft letter of intent that OSI intended to send to American Science and Engineering, Inc. ("AS&E"), which set forth OSI's proposal to acquire AS&E.  At that time, AS&E was a publicly traded company whose shares were traded on the NASDAQ exchange under the ticker symbol "ASEI".

On February 16, 2016, the CFO forwarded to defendant an email attaching a draft letter of intent to be sent to AS&E and setting forth OSI's proposal to acquire AS&E.  On February 17, 2016, OSI sent the letter of intent to AS&E.  OSI's proposed acquisition of AS&E was nonpublic information that a reasonable investor would find to be material.

On March 3, 2016, defendant purchased 10,000 shares of ASEI stock.  That same day, defendant received an email providing his itinerary to travel to Boston, Massachusetts to attend, on behalf of OSI, a due diligence meeting with AS&E regarding OSI's acquisition of AS&E.  Defendant attended the due diligence meeting with AS&E on March 9, 2016.

On June 21, 2016, OSI publicly announced OSI's acquisition of AS&E.  After the public announcement, and on the same day, during an OSI-initiated blackout period prohibiting OSI insiders, including defendant, from trading OSI and AS&E securities, defendant sold the 10,000 shares of ASEI stock he purchased in March 2016, and made a profit of $120,874.04.  (Escalante Decl., GEX 76.)

## III. ADVISORY SENTENCING GUIDELINES CALCULATION

As noted above, defendant was convicted of eight counts of securities fraud and insider trading related to the three December 28, 2015 OSI trades and the single March 3, 2016 AS&E trade.  (PSR ¶ 2.)  The jury acquitted defendant of two counts related to the November short sale.  (Id. ¶¶ 12-13.)

In the PSR, the USPO calculated defendant's total offense level at 24 based on the following: base offense level of 8 under U.S.S.G. §§ 2B1.4, plus a 14-level increase for a gain of more than $550,000 but less than $1,500,000 pursuant to U.S.S.G. § 2B1.1(b)(H), and a two-level enhancement for abuse of a position of trust under U.S.S.G. §§ 3B1.3; U.S.S.G. § 2B1.4, comment. (n.2).)  (PSR ¶¶ 40-51,112.) Because defendant went to trial to contest his guilt and was convicted by a jury, defendant did not receive an adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

As set forth in the government's response to the presentence investigation report (ECF 109), the government submits that in light of the evidence presented at trial, and the jury's acquittal on counts related to defendant's November 18, 2015 trade, defendant's November short sale should not be included as relevant conduct, and thus the $90,263.32 in profits he made from that trade should not be included in the Guidelines loss calculations.

On the other hand, defendant's sale in June 2016 of AS&E stock is properly included as relevant conduct because that trade was part of the same course of conduct or common scheme or plan as the offense of conviction -- namely defendant's March 2016 purchase of AS&E stock -- and the offense of conviction is of a character for which U.S.S.G. § 3D1.2(D) would require grouping with defendant's prior trades. (PSR ¶ 38.)  Thus, the $120,874.04 in profits defendant reaped from his sale of AS&E stock should be included in the loss calculations.

Accordingly, because defendant's total gain was $476,710.08, pursuant to U.S.S.G. § 2B1.1(b)(H), a 12-level increase to his offense level calculations should apply.  As such, the government submits that defendant's total offense level should be 22, as opposed to 24, and that his advisory Guidelines range should be 41-51 months.

## IV.  SECTION 3553(a) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The advisory Guidelines range provides the "starting point and . . . initial benchmark" for this Court's consideration of an appropriate sentence.  Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); the kinds of sentences available, § 3553(a)(3); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

**V.   GOVERNMENT'S SENTENCING RECOMMENDATION**

**A.   Term of Custody**

In light of the relevant § 3553(a) factors, a sentence at the high-end of the Guidelines of 51 months in prison is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

**1.   <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>**

The nature and circumstances of the offense here are serious. Defendant engaged in a troubling pattern of conduct that involved leveraging his privileged position as a trusted, corporate insider to use confidential, sensitive financial information that he possessed to bet against his own company in a series of sophisticated stock trades conducted in a brokerage account that was hidden from view from his employer.  He further used his professional knowledge and position for personal gain in purchasing shares of AS&E stock in that same secret account while simultaneously conducting due diligence on AS&E.  In so doing, he brazenly violated company policy by engaging in speculative options trades designed to profit in short-term swings in OSI stock price and trading during blackout periods and thus serially abused the trust that was placed in him by his employer.

The danger of this activity is clear.  Defendant was one of the key finance personnel at OSI and as such he had access to vast amounts of sensitive and confidential information.  His job required him to ensure that OSI's accounting functions were accurate and complete.  Defendant's options trades created a perverse incentive wherein defendant profited the most when OSI did poorly.  Put another way, defendant's actions created a scenario wherein his interests were adverse to OSI's interests—OSI's loss was defendant's gain. Defendant's willingness to profit from this conflict of interest stands in marked contrast to the sale of stock in November 2015 by other OSI executives who adhered to company policy by disclosing and pre-clearing their trades.  Moreover, evidence introduced at trial regarding stock sales by OSI executives show that those executives merely sold shares that they received as part of their compensation, thus ensuring that their interests were aligned with the company's general stockholders.  Defendant did the opposite.  Defendant flagrantly violated company policy by engineering speculative options trades to advance his own interests above those of his employer.

Defendant similarly abused OSI's trust in him by secretly purchasing AS&E shares as OSI was putting a deal in place to buy AS&E.  As the evidence at trial (including defendant's own testimony) showed, defendant played an integral role in the due diligence process for the AS&E deal.  The underlying purpose of due diligence is to conduct an honest, open, exhaustive examination of the target company to ensure that the acquisition is in the best interest of OSI's shareholders.  Defendant's undisclosed ownership of AS&E shares, which he had bought on the eve of the initial due diligence trip, was a secret thumb on the scale of that deal.  Although the

deal went through, and generally was a success for both companies, defendant's conduct jeopardized the honest appraisal process unbeknownst to the decisionmakers who relied on the accounting calculations and analysis defendant provided.

The fact that defendant has no prior criminal history is more indicative of the difficulties surrounding the detection, investigation, and prosecution of sophisticated securities fraud crimes than it is a mitigating factor.  Defendant's prior trading history in OSI stock reveals a troubling tendency to trade OSI stock during blackout periods and to buy and sell OSI stock in advance of press releases that result in significant movements in OSI's stock price, which are periods of time during which insiders are most at risk of possessing material non-public information.  The below examples of defendant's previous violations of blackout periods are consistent with his trading patterns during the OSI trades for which he was convicted and tend to show that defendant's true character is far from the image of the productive employee who "had never engaged in any known illegal conduct nor had any employment performance issues" and the innocent "buy low, sell high" trader that he attempted to project.

For example, based on information provided by OSI and a review of defendant's brokerage account records, defendant's Q2 FY2016 trades were not the first trades defendant engaged in which violated OSI's insider trading policy.  As set forth in OSI's insider trading policy effective in 2012 (essentially the same policy in effect during the trades for which defendant was convicted), OSI had a standing blackout period beginning five days before the end of each fiscal quarter and ending two days following the announcement of the

1   earnings release.  (Escalante Decl. Ex. 1.)  As noted in the PSR,

2   OSI's fiscal year begins July 1st and ends June 30th.  (PSR ¶ 19.)

3   The third quarter of OSI's fiscal year begins January 1 and ends

4   March 31.  Accordingly, a standing blackout period began March 27,

5   2012.  (Escalante Decl. Ex. 1.)  Notwithstanding that blackout

6   period, on April 10, 2012, defendant bought 5,900 OSIS shares.  (Id.

7   Ex. 19.)  OSI issued its earnings release on April 24, 2012 (id. Ex.

8   9), and the standing blackout period accordingly ended on April 25,

9   2012, (see id. Ex. 1).  On April 27, 2012, defendant sold the 5,900

10  OSIS shares (id. Ex. 19) and made a profit of approximately

11  $47,940.29 (id. Ex. 20).

12       As witnesses explained at trial, in addition to standing

13  blackout periods, OSI sometimes implemented special blackout periods.

14  On May 17, 2013, defendant received an email notifying him that he

15  was subject to one such blackout period.  (Id. Ex. 10.)  Contrary to

16  that email, on May 24, 2013, defendant entered a limit order in his

17  Charles Schwab account ending in -3944 to buy 4,000 OSIS shares at a

18  price of $55.01 with an expiration date of July 23, 2013.  (Id. Ex.

19  21.)  That order was filled on June 5, 2013.  (See id. Ex. 22.)

20  Also, on June 5, 2013, defendant bought 2,000 shares of OSIS shares

21  out of his Charles Schwab account ending in -3939.  (Id. Ex. 23.)  On

22  June 25, 2013, defendant received an email notifying him that the

23  special blackout period had ended.  (Id. Exs. 11, 12.)

24       More troubling than just trading during blackout periods,

25  however, is defendant's OSI trading history in light of his testimony

26  at trial that he spearheaded OSI's contract with its largest

27  customer, the Mexican government.  (Tr. 1530:14-21.)  Defendant

28  testified that beginning in 2012, he travelled to Mexico City from

                                  11

Los Angeles constantly prior to the execution of a large security contract with Mexico which, according to defendant, was "huge" and "by far the most profitable piece of [OSI's] business." (Tr. 1530:18-24; 1531:11-15; 1532:4-7.)  Defendant remembered at trial that OSI signed the contract on January 12, 2012 and that, "It was a big deal." (Tr. 1532:20-21.)  Defendant further explained that "[OSI] had not released [its] earnings yet for the quarter, but this [wa]s a material contract." (Tr. 1533:13-16.)

On January 18, 2012, OSI announced that it had received a six-year agreement for approximately $400 million to provide security services to the Mexican government. (Escalante Decl. Ex. 2.)  A few days later, on January 24, 2012, OSI announced its Q2 earnings for FY2012, in which it referenced the $400 million agreement. (Id. Ex. 2.)  On February 27, 2012, OSI announced an update to the agreement and informed the public that the total value of the contract was now $900 million. (Id. Ex. 5.)  Notably, however, the letter from the Mexican government increasing the scope of the contract from $400 million to $900 million was dated February 10, 2012, (id. Ex. 4), the same date on which defendant bought 8,000 shares of OSIS stock (id. Exs. 13-14.)  In the days leading up to its release, defendant had provided edits to the February 27, 2012 press release and was generally involved in its preparation. (See id. Exs. 6, 7, 8.)

A review of defendant's brokerage statements from that period shows that defendant or his family members made the following purchases of OSIS stock on the dates specified below, in the accounts specified below, before the $900 million contract was made public:

///

///

12

| Account No. | Date | Amount | Price Per Share |
|---|---|---|---|
| 3939 | 2/10/2012 | 3,000 | $52.77 |
| 3944 | 2/10/2012 | 5,000 | $52.80 |
| 3974 | 2/24/2012 | 355 | $53.50 |
| 3975 | 2/24/2012 | 355 | $53.50 |
| 7506 | 2/24/2012 | 320 | $53.50 |

(See Escalante Decl. Exs. 13, 14, 15, 16, 17.)  On March 9, 2012, defendant sold 3,000 shares of the OSIS stock he had bought on February 10, 2012 at a price of $61.30 and made a profit of $25,568.52.  (See Escalante Decl. Ex. 18.)  The government does not seek to include these trades as relevant conduct, but these trades show a pattern of defendant's trading in OSI stock while he was in possession of inside information before its release to the public that he himself testified was material.

In addition, although the November 2015 trade should not be included as relevant conduct in the offense of conviction for the reasons set forth above, that short sale nevertheless shows defendant's willingness to flagrantly violate his employer's policy in yet another way, by short selling OSI stock despite there being no question that such conduct was prohibited by his employer's insider trading policy.

In recommending a 15-month sentence (ECF 106 at 4-5, PSR ¶ 125), the USPO stated that the nature and circumstances of defendant's involvement in the offense and his family circumstances may warrant a below Guidelines sentence (PSR ¶ 164.)  The government respectfully disagrees.  Defendant had all the advantages of a stable, loving

13

upbringing in a "close knit family." (PSR ¶ 65.) He was well-educated and had a series of upwardly mobile, well-paying jobs. (PSR ¶¶ 84-93.) He had even gained the respect and trust of his OSI colleagues. But, despite his abilities and aptitudes, defendant chose to employ his talents for a bad purpose — to break the law — and showed his willingness to do so again and again.

A sentence at the high-end of the advisory Guidelines range of 41-51 months in prison is appropriate based on an individualized assessment of this defendant and the circumstances of his involvement in the criminal conduct for which he was convicted.

2. Seriousness of the Offense, Respect for the Law, Just Punishment, and Deterrence (18 U.S.C. § 3553(a)(2)

A 51-month sentence constitutes just punishment because it is commensurate with the nature, scope, and seriousness of defendant's crime as discussed above. As the USPO recognized, defendant's actions "could be seen as even more significant as he was fully aware of OSI's policy on insider trading and was surely aware of the prohibitions on such activity given his overall professional experience, including his CPA license." (ECF 106 at 5.) Put simply, defendant knew better than to do what he did. And yet he did it anyway. His trades were even more brazen when viewed in light of comments from OSI executives like CEO Deepak Chopra, Victor Sze (OSI's General Counsel), and even defendant's friend and direct supervisor Alan Edrick, the CFO. All of whom expressed shock that defendant would make such trades and essentially testified at trial that defendant "knew better" than to make the trades that he made and should have been especially attuned to the unlawfulness of his conduct given his position as the number two person in the corporate

14

finance group of a publicly traded company.  A variance under these circumstances will undermine the overall deterrent effect here – both as to defendant and society at large.

To that end, the recommended punishment here will serve the purposes of both specific and general deterrence.  Defendant's trial testimony during which he offered numerous rationalizations for his illegal trades justifies a significant sentence because such rationalizations make him more of a risk to recidivate.  Notable examples of these rationalizations include his self-serving explanation for the lie he told to OSI's in-house counsel in response to the FINRA questionnaire which asked him the date he first became aware of the pending AS&E transaction and his incredible trial testimony regarding his purported confusion regarding OSI's blackout periods, which stood in stark contrast to his statements during the recorded interview with FBI agents.  Although these rationalizations may not warrant a guidelines enhancement for obstruction of justice, the Sentencing Commission provided a means for their consideration in terms of fashioning a just sentence within the applicable guidelines range.  See U.S.S.G. § 3C1.1 cmt. n.3, 5 (conduct that "do[es] not warrant application of this adjustment [] may warrant a greater sentence within the otherwise applicable guidelines range.").  As such, a 51-month sentence is sufficient but not greater than necessary to specifically deter defendant.  Likewise, a significant custodial sentence will provide general deterrence to others who might believe that they can manipulate markets by trading on inside information to enrich themselves without impunity.  General deterrence is especially important in this case because the proper functioning of a free and open market requires transparency and

openness, as opposed to the secrecy, obfuscation, and concealment of defendant's actions here.  As such, the recommended sentence balances these interests, provides for adequate deterrence, and promotes respect for the law.

> ### 3. The Kinds of Sentence and the Sentencing Range Established by the Sentencing Guidelines and the Need to Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(4), (a)(6))

The USPO bases its unjustified variance on defendant's "overall positive and productive background including his strong family ties, record of gainful employment, overall productive life, and that similar actions are not likely to repeat."  (ECF 106 at 5.)  But, as articulated above, those are the very reasons why the Court should impose a significant sentence in this case; defendant had every opportunity and benefit available to him and yet, he chose to engage in illegal conduct so that he could line his own pockets.

Here, the Guidelines are the starting point and, as shown above, this does not appear to be the first time that defendant made trades based on nonpublic information he learned from his employer.  The chief difference between his 2012 trades and the trades he made in December 2015 and March 2016 is that he was caught.  Nor was this the first time that defendant violated company policy by trading during blackout periods.  Nor is defendant situated differently than other defendants convicted of securities fraud offenses.  According to a report by the U.S. Sentencing Commission's on "The Criminal History of Federal Economic Crime Offenders," between fiscal years 2016 to 2018, of the defendants sentenced for securities & investment fraud

offenses, 55.7% had no prior convictions just like defendant.  <u>See</u>
<u>The Criminal History of Federal Economic Crime Offenders</u>, USSG (Feb.
2020), at 30-31, available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2020/20200227_Crim-Hist-Econ.pdf
(last visited November 15, 2021).  As such, defendant is not an
outlier in that regard.

The USPO's recommended variance is not warranted in this case
and would result in unwarranted sentencing disparities among
defendants with similar records who have been found guilty of similar
conduct.

**B.   Restitution**

The USPO correctly noted that the Mandatory Victim Restitution
Act ("MVRA") applies to defendant's convictions for securities fraud
under Title 18.  (PSR ¶ 8.)  Conversely, however, the PSR also stated
that restitution is inapplicable in this case.  (PSR ¶ 123.)  The
government respectfully disagrees.  The Mandatory Victim Restitution
Act ("MVRA") requires a district court to order restitution when (1)
a defendant commits an "offense against property," and (2) there is
an identifiable "victim."  18 U.S.C. § 3663A(a)(1), (c)(1).  A victim
is "a person directly and proximately harmed as a result of the
commission of an offense for which restitution may be ordered."  18
U.S.C. § 3663A(a)(2).  The MVRA provides for "restitution to each
victim in the full amount of each victim's losses," and restitution
must be determined "without consideration of the economic
circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A); 18
U.S.C. § 3663A(d) (a restitution order under Section 3663A "shall be
issued and enforced in accordance with section 3664").

17

1    Courts have issued restitution orders in numerous cases
2  pertaining to securities fraud convictions under Title 18.  See,
3  e.g., United States v. Gupta, 925 F. Supp. 2d 581, 586 (S.D.N.Y.
4  2013) (awarding restitution to defendant's employer where the
5  defendant was convicted of insider trading); United States v.
6  Afriyie, No. 16-cr-377 (PAE), 2020 WL 634425, at *1-2 (S.D.N.Y. Feb.
7  11, 2020) (same); United States v. Skowron, 839 F. Supp. 2d 740, 745
8  (S.D.N.Y. 2012).  In these cases, the defendant-employee's criminal
9  activity "solely furthered the employee's interests at the employer's
10  expense."  United States v. Petit, No. 19-CR-850 (JSR), 2021 WL
11  2056826, at *5 (S.D.N.Y. May 23, 2021).

12    Here, defendant's former employer, OSI, should be entitled to
13  restitution for any expenses it incurred that were necessary and
14  foreseeable in providing assistance to the government's investigation
15  and prosecution of defendant's criminal conduct.  See Lagos v. United
16  States, 138 S. Ct. 1684 (2018); In re: Akebia Therapeutics, Inc., 981
17  F.3d 32, 37 (1st Cir. 2020) (affirming district court's restitution
18  order related to expenses that a corporation incurred which "were
19  integral to [the corporation's] participation in the government's
20  investigation and prosecution of the offenses in the criminal
21  proceedings" in an insider trading case).  Accordingly, pursuant to
22  18 U.S.C. § 3664(d)(5), the government requests that the Court set a
23  date, not to exceed 90 days after sentencing, for the final
24  determination of any losses sustained by OSI in this matter that may
25  be properly included in a final order of restitution.

26    **C.  Supervised Release**

27    The USPO determined that the maximum term of supervised release
28  for the securities fraud counts on which defendant was convicted is

five years, with a Guidelines range of two to five years because the offense is a class B Felony.  (PSR ¶¶ 114-115.)  The USPO further determined that the maximum term of supervised release for the insider trading counts of conviction is three years, with a Guidelines range of one to three years because the offense is a Class C Felony.  (Id.)  The USPO has recommended that the Court impose a two-year term of supervised release.

Per 18 U.S.C. § 3583(c), the factors the Court should consider in imposing a term of supervised release are factors found at 3553(a)(1) (the nature and circumstances of the offense); (a)(2)(B) (the need to afford adequate deterrence); (a)(2)(C) (the need to protect the public); (a)(2)(D) (the need to provide defendant with needed training, medical care, or correctional treatment); (a)(4) (the kinds of sentence and sentencing range); (a)(5) (pertinent policy statements); (a)(6) (the need to avoid unwarranted sentencing disparities); and (a)(7) (the need to provide restitution).

Here, for the same reasons articulated above, the government submits that a three-year term of supervised release following defendant's custodial sentence is appropriate, particularly if the Court decides to impose a variance below the advisory Guidelines range.  Moreover, as the government anticipates that defendant will be ordered to pay restitution, a three-year term of supervised release will also provide the Court with the ability to oversee defendant's efforts to pay restitution during the term of supervised release.

### D.   Fine

The USPO further determined that the fine range for the offenses of conviction is $20,000 to $5,000,000, and that the maximum fine for

the securities fraud counts of conviction is $250,000 or twice the gross gain or gross lost resulting from the offense, whereas the maximum fine for the insider trading counts of conviction is $5,000,000.  (Id. ¶¶ 119, 121.)  If the Court adopts the government's offense level calculations, then the fine range for the offense should be $15,000 to $5,000,000.

The Guidelines instruct that, "[t]he court shall impose a fine in all cases, except where defendant establishes that he is unable to pay and is not likely to become able to pay."  U.S.S.G. § 5E1.1(a).  Some of the factors the Court must consider when determining whether a fine is appropriate are: (1) "any evidence presented as to the defendant's ability to pay the fine;" (2) "the burden that the fine places on the defendant and his dependents relative to alternative punishments;" (3) "any restitution or reparation that the defendant has made or is obligated to make;" and (4) "whether the defendant previously has been fined for a similar offense."  U.S.S.G. § 5E1.2(d).

The government concurs with the USPO's recommendation that the Court impose a fine of $600,000 considering the USPO's finding that defendant has the ability to pay such a fine.  (PSR ¶¶ 108-109.)  The imposition of such a fine is sufficient to ensure an appropriate punishment for defendant's criminal conduct.

### E.   Mandatory Special Assessment

The government concurs with the USPO's recommendation that defendant pay the $800 special assessment, which is mandatory in this case.

## VI.  CONCLUSION

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant Mark Loman: (1) 51 months' imprisonment; (2) a three-year period of supervised release; (3) restitution in an amount to be determined at a deferred restitution hearing; (4) a fine of $600,000; and (5) a mandatory special assessment of $800.